UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

|  |  |  |
|---|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 2:23-cv-00080-LEW |
| PETE BUTTIGIEG, SECRETARY, U.S. DEPARTMENT OF TRANSPORTATION, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs National Trust for Historic Preservation, Friends of the Frank J. Wood Bridge, Historic Bridge Foundation, and Waterfront Maine, Brunswick, LLC ("Plaintiffs"), petition the Court for preliminary injunctive relief that halts, pending further litigation, any steps to replace the Frank J. Wood Bridge pursuant to authorization granted by Defendants Pete Buttigieg, Secretary of the United States Department of Transportation, Shailen Batt, Administrator of the Federal Highway Administration ("FHWA"), Todd Jorgensen, Administrator of the Maine Division of the FHWA, and Bruce Van Note, Commissioner of the Maine Department of Transportation ("MaineDOT") (collectively, "Defendants"). Plaintiffs claim that Defendants' decision to demolish and replace the Frank J. Wood Bridge runs roughshod over historic preservation standards embodied in Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), associated law governing to the preservation of parklands, 23 U.S.C. § 138(a), and procedural rights protected under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332.

Plaintiffs Motion for Preliminary Injunction (ECF No. 15) is DENIED.

## BACKGROUND

The municipalities of Brunswick and Topsham are divided by the Androscoggin River. Although there are other river crossings to the east (a bypass route) and west (I-295), the Frank J. Wood Bridge is a particularly important vehicular and pedestrian connection because it carries U.S. Route 201 over the Androscoggin River and ties these communities together. The Androscoggin Power Company built the Bridge in 1932 to carry interurban rail traffic. It has since been resurfaced for vehicular traffic. The Bridge is today a contributing resource in the Brunswick and Topsham Industrial Historic District, alongside the Cabot Mill and the Pejepscot Paper Company. Although the Bridge is a historical asset, it presents certain attributes disfavored by MaineDOT. In particular, the Bridge is in poor condition and, if retained, requires substantial rehabilitation. That rehabilitation could extend the life of the Bridge by as many as 75 years, but ongoing safety concerns are real and regular maintenance requirements will introduce substantial carrying costs over and above what is expected of a new bridge structure.

MaineDOT initiated the Frank J. Wood Bridge Improvement Project ("Project") in 2015. Because federal funds would be used to construct the Project, MaineDOT applied to the FHWA, a division of the U.S. Department of Transportation, seeking approval of its plan. MaineDOT and FHWA (together, the "Agencies") considered several alternatives, including three replacement alternatives involving a steel girder bridge and two alternatives involving rehabilitation. After a review process, the Agencies chose a replacement alternative. FHWA determined that the rehabilitation alternatives were not prudent because they would result in additional construction, maintenance, or operational costs of an extraordinary magnitude.

On September 6, 2019, a civil action was filed to prevent the Agencies from implementing the replacement project. *Historic Bridge Found. v. Chao*, No. 2:19-cv-00408-LEW. In February

2021, I issued an order granting summary judgment to Defendants in that action.  On appeal, the First Circuit affirmed all of my conclusions but one and remanded the matter "with instructions that the matter be returned to the FHWA for the strictly limited purpose of allowing the agency to further justify use of the service-life analysis and/or to decide whether a 53% price differential represents a cost of an extraordinary magnitude under 23 C.F.R. § 774.17."  *Historic Bridge Found. v. Buttigieg*, 22 F.4th 275, 286 (1st Cir. 2022).  On March 2, 2022, I issued an order of remand for further administrative proceedings consistent with the opinion of the First Circuit.

On January 27, 2023, the Agencies issued a "Section 4(f) Limited Scope Re-Evaluation, Pursuant to 49 USC 303 Department of Transportation Act of 1966."  (Mot. Ex. 2, ECF No. 15-3).  Therein, the Agencies further justified their cost assessment.  In the conclusion of the Re-Evaluation, they found that the rehabilitation alternative preferred by Plaintiffs, found in 2019 to present an increased cost of 53% would "result in additional construction, maintenance, and operational costs of an extraordinary magnitude, and therefore [is] not [a] prudent alternative[]" for the Agencies preferred replacement project.  *Id.* at 14.  Concerning its methodology, the Agencies explained that they were restricting their review to the remand instruction.  *Id.* at 2 ("The scope of this Re-Evaluation is limited to the conduct of an analysis directed by a United States District Court Order.").  They then went on to reevaluate their determination in the context of the cost estimates generated in 2019, purposing to close the gap left open in the prior litigation. Concerning closure of that gap, they explained:

> In determining whether the additional expenditure required to construct an avoidance alternative was of an extraordinary magnitude and therefore not prudent, FHWA & MaineDOT considered the Present Value Life Cycle costs of Alternatives 2, 3, and 4.  Based upon this consideration alone, FHWA concludes that Alternatives 3 and 4 present costs of extraordinary magnitude and are not prudent avoidance alternatives.  However, FHWA & MaineDOT also considered additional factors that support this conclusion.  In particular, the Agencies considered that Rehabilitation Alternatives 3 and 4 would require the State of Maine to bear the

3

> costs and risks of keeping a Fracture Critical Bridge in the State Asset Inventory. Further, the Agencies took account of differences in Service Life Cost between the various alternatives given that inquiry reflects MaineDOT's funding realities and limited ability to budget for future costs.

*Id.* at 11.  From there, the Agencies explained that they also considered in their analysis the fact that "there is added risk and uncertainty to keeping a fracture critical bridge in service beyond its intended service life, even if it is extensively rehabilitated." *Id.*  Using discounted dollars based on the original life cycle costs estimates, they offered the assessment that rehabilitation is not a prudent alternative.

> Spending 53% more money to rehabilitate, maintain, and frequently inspect a fracture critical bridge that comes with more stringent and costly federal inspection requirements, traffic impacts, and increased user costs to the public is not prudent, and bears on the consideration of whether that 53% differential constitutes one of an extraordinary magnitude.

*Id.* at 11-12.  Additionally, using service-life considerations (the proposed rehabilitation project has a shorter life expectancy, meaning its higher future costs are also carried over the course of fewer years), they also concluded that "a 53% difference in net present values between Rehabilitation Alternative 3 and Replacement Alternative 2 translates to increased undiscounted costs to the agencies that is nearly double." *Id.* at 12.[1]  Given these calculations, the Agencies concluded that "the difference in Life Cycle Costs to construct, maintain and operate the specific rehabilitation and replacement options over their expected life spans presents a cost of extraordinary magnitude." *Id.* at 13.  Concerning the Plaintiffs' preferred rehabilitation alternative, the Agencies found that "the expenditure of additional funds to construct Alternative 3, which has a shorter life span and leaves a fracture critical bridge in place is dismissed as not prudent per 23 CFR 774.17 Part 3 (iv)." *Id.*

---

[1] The Agencies offer that present-value discounting can be misleading insofar as the present-day discount for a repair slated to occur 60 years from now produces a present-day cost beneath what it would actually costs to perform the repair today.  Mot. Ex. 2 at 13.

Plaintiffs allege that by taking this approach the Agencies unlawfully disregarded requests by the Plaintiffs and others to consider new budgetary information (including the winning bid) indicating that the costs for bridge construction has escalated dramatically since the FHWA's 2019 decision. They also offer an alternative cost comparison from Plaintiffs' expert that assumes that the cost to rehabilitate the existing bridge has not similarly escalated. In an addendum to the Re-evaluation, the Agencies anticipated this contention. They "acknowledge[d] that the current cost estimate for the bridge replacement project has increased since the original cost estimates were prepared during the NEPA process," but rejoined that the purpose of the RE-Evaluation "is to respond to the remand instructions." Summary of Comments & Responses § C (ECF No. 15-3, PageID # 129). Nonetheless, the Agencies spoke to the Plaintiffs' alternative cost comparison, concluding that the alternative estimates were flawed and reasserting that future carrying costs "are what truly separate the two alternatives." *Id.*

On February 24, 2023, Plaintiffs filed a new civil action seeking declaratory and injunctive relief. Plaintiffs argue that the Agencies' failure to take a "hard look at new information" ignores requirements imposed on the Agencies under NEPA and associated regulations adopted by the Department of Transportation. Motion at 8-12 (citing 23 C.F.R. §§ 771.129(c), 771.130(c)). Plaintiffs maintain that if the Agencies consider the new information they will not be able to escape the conclusion that "the delta between the life cycle costs of the [rehabilitating the Bridge] versus the replacement alternative is flipped on its head." *Id.* at 14. Defendants respond that given the narrow scope of the remand order it was appropriate and lawful for the Agencies to decide not to conduct a reappraisal of their cost estimates as "[n]either this Court's remand order nor the First Circuit opinion contemplates re-opening the record, taking new evidence, or engaging in any other formal process." Defs.' Opp'n at 8-9 (ECF No. 16).

In their Opposition, Defendants state that the demolition of the Frank J. Wood Bridge is not planned until the end of the Project once the new bridge is open to traffic. They report that project completion is scheduled for November 2026. They also assert that further delay calls into question whether the Frank J. Wood Bridge will remain serviceable through the Project's completion date and that any delay associated with a preliminary injunction will likely result in costly change orders.

On July 26, 2023, Plaintiffs filed a status report. They explain that in response to an inquiry from Plaintiffs, counsel for Defendant FHWA provided the following information concerning the contractor's work schedule.

> MDOT's contractor, Reed and Reed Construction, has begun setting up access to the river, and expects to be working in the river on or about August 1 on necessary abutment work. Reed and Reed is working on installing the temporary trestle, which will be used to assist in constructing the new bridge. The foundations consist of both rock socketed pipe pile, which are drilled into the ledge, along with pipe pile anchored to grout pads cast on top of the ledge in locations where the piles are not in the water. The contractor will eventually begin detour work involving sidewalks with pedestrian traffic to be shifted and temporary crosswalks installed with flashing lights on crosswalks at both ends of the bridge, but this work may not begin for some time.
>
> This description covers the majority of what will be occurring over the next 6-9 months. Reed and Reed plans on working throughout the winter installing the temporary trestle, building the abutments, and installing cofferdams for the new piers and abutments.

Status Report (ECF No. 29).

The Court's Scheduling Order calls for merits briefing to be complete in October of this year. I anticipate that I will be in the position to issue a prompt determination very shortly thereafter.

**DISCUSSION**

Injunctive relief is "an extraordinary and drastic remedy that is never awarded as of right." *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011) (citations and quotation marks omitted). "To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet, Inc. v. Rainbow Treecare Sci. Advancements, Inc.*, 794 F.3d 168, 171 (1st Cir. 2015). As the party seeking injunctive relief, Plaintiffs bear the burden of establishing that the factors weigh in their favor. *See Diaz-Carrasquillo v. Garcia-Padilla*, 750 F.3d 7, 10 (1st Cir. 2014)*; Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

"Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). On this issue "the district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at 16). The showing required of the party with the burden to show it is "likely to succeed" varies depending on the relevance of the remaining preliminary injunction factors. If the party fails to make a persuasive showing of likelihood of success, then generally it will lose the motion. *Cf. New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). But the strength of the other three factors can inform the burden of showing likelihood of success. In other words, although likelihood of success is the main bearing wall of the preliminary injunction standard, when the remaining factors strongly favor the party with the burden on the merits, a somewhat lesser showing as to the merits

7

may suffice.  *Cf. Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009) (Easterbrook, C.J.).  Ultimately, "trial courts have wide discretion in making judgments regarding the appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1, 14 (1st Cir. 2009).

### A.      Likelihood of Success

Plaintiffs maintain that the Agencies are required to evaluate present conditions and essentially conduct a do-over in terms of cost calculations.  They rely chiefly on 23 C.F.R. § 771.129 ("Re-evaluations"), which instructs the FHWA to determine whether an approved environmental document remains valid prior to granting any new approval or amending a prior approval pursuant to the Transportation Act.  I am not convinced that the regulation will carry the day for Plaintiffs.  Nothing has changed in terms of the administrative approval.  The Re-evaluation closes a gap the Agencies were ordered to address in the order of remand; the Re-evaluation does not propose to grant approval for any new or amended action not previously approved.

Plaintiffs also point to 40 C.F.R. § 1502.9 ("Draft, final, and supplemental statements"), which instructs agencies to prepare supplemental NEPA environmental impact statements when they intend to make a substantial change to a proposed action or there are significant new circumstances "relevant to environmental concerns."  I am not convinced that this argument will serve, either, given that the environmental impact has not changed.

Finally, I am not convinced that it is likely I will find that the Agencies have conducted themselves in an arbitrary fashion by cabining their reevaluation process to the dictates of the remand order or in finding that the rehabilitation alternative results in a cost differential of an extraordinary magnitude.

**B.    Irreparable Harm**

The irreparable harm factor, similarly, does not require an injunction.  The Project relies on the Frank J. Wood Bridge to carry traffic until the replacement bridge is constructed.  Given the schedule in place for merits briefing, I anticipate an order on the merits this fall.  Plaintiffs have not persuaded me that a fall ruling will come too late to ensure preservation of the Frank J. Wood Bridge in the event they succeed on the merits.

**C.    Equitable Considerations**

Given the foregoing discussion, I find at best equipoise.

**D.    Public Interest**

The public interest here is, similarly, in equipoise at best.  For example, although by no means determinative, the elected officials of both Brunswick and Topsham have issued recent resolutions finding it to be in the public interest to replace the Frank J. Wood Bridge.

CONCLUSION

Plaintiffs' Motion for Injunctive Relief is DENIED.

**SO ORDERED.**

Dated this 28th day of July, 2023.

                                          /s/ Lance E. Walker
                                          UNITED STATES DISTRICT JUDGE