UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| NATIONAL TRUST FOR HISTORIC PRESERVATION IN THE UNITED STATES, FRIENDS OF THE FRANK J. WOOD BRIDGE, HISTORIC BRIDGE FOUNDATION, and WATERFRONT MAINE, BRUNSWICK, LLC, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 2:23-cv-00080-LEW |
| PETE BUTTIGIEG, SECRETARY, U.S. DEPARTMENT OF TRANSPORTATION, | ) ) ) ) | |
| SHAILEN BHATT, ADMINISTRATOR, FEDERAL HIGHWAY ADMINISTRATION, | ) ) ) ) | |
| TODD JORGENSEN, ADMINISTRATOR, FEDERAL HIGHWAY ADMINISTRATION, MAINE DIVISION, and | ) ) ) ) ) | |
| BRUCE VAN NOTE, COMMISSIONER, MAINE DEPARTMENT OF TRANSPORTATION, Defendants. | ) ) ) ) ) | |

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT ON THE
<u>ADMINISTRATIVE RECORD</u>**

The Frank J. Wood Bridge ("the Bridge") has connected Brunswick to Topsham since 1932.  But keeping the Bridge in service much longer would require extensive rehabilitation.  Starting in 2015, the Maine Department of Transportation ("MDOT") began consulting with the Federal Highway Administration ("FHWA") to consider the Bridge's future.  Instead of rehabilitating the Bridge, MDOT has decided to build a new bridge and demolish the Frank J. Wood Bridge, and FHWA has approved of MDOT's decision.

Those decisions are under review in this case.  The National Trust for Historic Preservation in the United States, Friends of the Frank J. Wood Bridge, Historic Bridge Foundation, and Waterfront Maine, Brunswick, LLC ("Plaintiffs") sued Defendants Pete Buttigieg, Secretary, U.S. Department of Transportation; Shailen Bhatt, Administrator, FHWA; Todd Jorgensen, Administrator, FHWA, Maine Division; and Bruce Van Note, Commissioner, MDOT (collectively "Defendants" or "Agencies"), seeking judicial review of the Agencies' decision under the Administrative Procedures Act ("APA").  Plaintiffs argue that the Agencies did not comply with the National Environmental Policy Act of 1969 ("NEPA") and section 4(f) of the Department of Transportation Act.

The matter is before the Court for final disposition on the parties' motions for summary judgment on the administrative record.  For the following reasons, Plaintiffs' motion for summary judgment is DENIED and Defendants' cross-motions for summary judgment are GRANTED.

## BACKGROUND

The Androscoggin River divides the municipalities of Brunswick and Topsham. While the river can be crossed in the east through a bypass route and the west through I-

295, the Frank J. Wood Bridge has served as an important vehicular and pedestrian connection because it carries U.S. Route 201 over the river, tying these communities together.  This 805-foot long, three-span, steel through-truss bridge is supported by concrete abutments at each end and two interstitial concrete piers.  The Androscoggin Power Company constructed the Bridge in 1932 to carry interurban rail traffic, and it was subsequently resurfaced for vehicular traffic.  Today, the Bridge is a contributing resource in the Brunswick and Topsham Industrial Historic District, which includes the historic Cabot Mill and Pejepscot Paper Company.  The Bridge is also individually eligible for listing in the National Register of Historic Places because of its historical and architectural significance.

While the Bridge is a historical asset, it presents capacity and structural concerns. Nearly 19,000 vehicles cross the Bridge each day, posing challenges for bicyclists riding amid traffic and pedestrians coming to the bridge from the east side of the roadway who must cross the highway to access the solitary pedestrian causeway on the west side. Following the collapse of a steel truss bridge in 2007 in Minneapolis, Minnesota, Maine Governor John Baldacci directed MDOT to review the safety of Maine's bridges and take actions to mitigate safety concerns.  That same year, MDOT issued a report, titled Keeping Our Bridges Safe, that identified forty-four fracture-critical bridges in Maine, including the Frank J. Wood Bridge.  *See generally* AR 2.  These fracture-critical bridges lack redundant supporting components, so if a structural member failed, the bridge would likely collapse. Because of the historic Bridge's age and fracture-critical status, more detailed biennial inspections are required.

3

In 2015, MDOT launched the Frank J. Wood Bridge Improvement Project to address the Bridge's capacity and structural issues and to improve mobility and safety for pedestrians and bicyclists. A 2016 inspection of the Bridge concluded that it was structurally deficient and thus unable to support some legal vehicle weights. Therefore, MDOT placed weight limits on vehicles that may cross the Bridge. The Project assessed the feasibility of alternatives providing for rehabilitation or replacement. MDOT considered three alternatives in detail. Alternatives 3 and 4 involved rehabilitating the Bridge to extend its service life by 75 years. The only difference between these two rehabilitation alternatives is that Alternative 4 included a new easterly sidewalk. By contrast, Alternative 2 entailed constructing a new steel girder bridge on a curved alignment upstream from the current Bridge. This new bridge is expected to last for 100 years and would include sidewalks and five-foot shoulders on each side to accommodate pedestrians and bicyclists. The Frank J. Wood Bridge would be demolished after the replacement bridge was constructed.

In its decision-making process, MDOT estimated the construction and maintenance costs of each alternative. MDOT principally relied upon using service-life costs rather than life-cycle costs. A structure's service life is defined as the number of years that it can be part of the transportation system with maintenance and repair or rehabilitation before its eventual replacement. Service-life costs represent the total cost to maintain a structure over its anticipated service life. Thus, a bridge's service-life cost includes the costs of initial construction, maintenance, inspections, and expected future improvements. Costs are broken down into required annual costs (e.g., inspections and anticipated maintenance) as

4

well as periodic items (e.g., bridge painting, deck replacements, and structural rehabilitation).

In contrast to service-life cost analysis, life-cycle cost analysis ("LCCA"), converts the estimated costs for each alternative over the defined life-cycle analysis period into current dollar equivalents, which is labeled as the present value.  LCCA accounts for the estimated construction costs of a project, the discounted present value of anticipated future costs, and the estimated remaining value of a structure at the end of the analysis period. LCCA also accounts for differences in the design life between alternatives.  Thus, LCCA is helpful in identifying the most cost-effective solution and discourages decision-making based solely on the initial cost.  For this reason, using LCCA to compare the present value costs of alternatives is "[t]he standard criterion for deciding whether a government program can be justified on economic principles."  OMB, *Guidelines and Discount Rates for Benefit-Cost Analysis of Federal Programs*, 1992 WL 12667340, at *3 (Oct. 29, 1992).

Although LCCA provides a standard to justify increased upfront expenditures to obtain long-term efficiencies, MDOT reasoned that service-life costs provided the more accurate comparison of the real costs in evaluating bridge improvement alternatives.  In its analysis, MDOT used cost estimates from its 2016 Preliminary Design Report.  *See generally* AR 7.  Using service-life costs, MDOT concluded that replacing the Bridge would cost $17.3 million over the new bridge's 100-year life whereas rehabilitating the historic Bridge using Alternative 3—the cheaper of the two[1] rehabilitation alternatives—

---

[1] Alternative 4's life-cycle costs are $38.2 million over 75 years.  Alternative 4 is more expensive than Alternative 3 since Alternative 4 involves constructing an additional sidewalk.

would cost $35.2 million over 75 years.  Based on this $17.9-million difference and the other benefits of a new bridge, MDOT concluded that it would construct a new bridge and decommission the Frank J. Wood Bridge.

Because federal funds would be used in constructing the new bridge, MDOT applied to FHWA, a division of the U.S. Department of Transportation, for approval of its plan. *See* 23 U.S.C. § 106.  When federal funds are sought for projects that may implicate historic sites, agencies must comply with two federal statutes: NEPA and section 4(f) of the Department of Transportation Act.

NEPA is designed to ensure that agencies have considered information concerning the environmental consequences of their actions.  Thus, NEPA requires agencies to produce an Environmental Impact Statement ("EIS") when a proposed action will "significantly affect[ ] the quality of the human environment."  42 U.S.C. § 4332(2)(C).  If an agency believes that an EIS will not be required, it will prepare an environmental assessment ("EA") documenting its conclusions.  If an agency ultimately concludes that an EIS is not needed, it will issue a Finding of No Significant Impact explaining its decision. 40 C.F.R. §§ 1501.4(a), 1508.9(a)(1), 1508.13 (amended and reconfigured by 85 Fed. Reg. 43,304 43,324 (July 16, 2020)).

Section 4(f) prohibits the Secretary of Transportation from approving the use of protected property, such as "historic site[s] of national, State, or local significance," in a transportation project unless "there is no prudent and feasible alternative to using that land" and "the program or project includes all possible planning to minimize harm to the" historic site.  49 U.S.C. § 303(c).  FHWA's regulations under section 4(f) provide that an

alternative is not prudent if it "results in additional construction, maintenance, or operational costs of an extraordinary magnitude." 23 C.F.R. § 774.17.

In February 2018, FHWA released its preliminary EA and section 4(f) evaluation analyzing the alternatives. FHWA adopted MDOT's cost estimates and agreed with MDOT that service-life analysis was the most accurate methodology to compare the alternatives' expected costs. Having compared these figures, FHWA concluded that the rehabilitation alternatives were not prudent and resulted in costs of extraordinary magnitude.

Despite receiving comments faulting FHWA for using service-life costs rather than life-cycle costs for its analysis, FHWA issued its Environmental Assessment and Final Section (4)f Evaluation in February 2019, concluding that the rehabilitation alternatives were not prudent since they would result in additional construction, maintenance, or operational costs of an extraordinary magnitude. AR 8 at 1199. Based on the service-life cost differential between $17.3 million over 100 years and $35.2 million over 75 years, FHWA reasoned that rehabilitation was imprudent. Thus, FHWA approved MDOT's decision adopting Alternative 2's plan to construct a new bridge and to demolish the historic Bridge once construction finished. FHWA made no determination about whether these costs, if discounted to present value using LCCA ($13.7 million over 100 years and $20.99 million over 75 years), would be imprudent as costs of an extraordinary magnitude. In March 2019, FHWA issued a Finding of No Significant Impact, explaining why the project did not require a full EIS. *See* AR 23.

In September 2019, Plaintiffs Friends of the Frank J. Wood Bridge, National Trust for Historic Preservation in the United States, and The Historic Bridge Foundation filed suit in this Court, seeking declaratory and injunctive relief to prevent the Agencies from executing the chosen replacement alternative. *Historic Bridge Found. v. Chao*, No. 2:19-cv-00-408-LEW. Plaintiffs argued that FHWA's administrative decision was arbitrary and capricious, an abuse of discretion, or otherwise violative of NEPA and section 4(f). More specifically, Plaintiffs argued that FHWA acted arbitrarily and capriciously by failing to compare the discounted life-cycle costs of the alternatives, and they asserted numerous line-item challenges to the cost estimates. In February 2021, I rejected Plaintiffs' arguments and granted summary judgment to the Defendants. *Historic Bridge Found. v. Chao*, 517 F. Supp. 3d 9 (D. Me. 2021), *aff'd in part*, *vacated in part*, *remanded sub nom. Historic Bridge Found. v. Buttigieg*, 22 F.4th 275 (1st Cir. 2022). Plaintiffs appealed, and the First Circuit affirmed all my conclusions except for one in January 2022. The First Circuit held that FHWA's cost analysis under section 4(f) was arbitrary and capricious. *See Historic Bridge Found.*, 22 F.4th at 284–86. The court observed that the U.S. Department of Transportation and FHWA's guidelines indicated that LCCA was the preferred method for cost analysis, and it reasoned that FHWA did not sufficiently explain its decision to forego its own guidance favoring LCCA and instead rely on service-life costs. *See id.* at 285. Thus, the First Circuit remanded the case "with instructions that the matter be returned to the FHWA for the strictly limited purpose of allowing the agency to further justify use of the service-life analysis and/or to decide whether a 53% price differential represents a cost of an extraordinary magnitude under 23 C.F.R. § 774.17." *Id.*

at 286.   In March 2022, I issued an order of remand that quoted the First Circuit's instructions.

FHWA published its draft Section 4(f) Limited Scope Re-Evaluation on July 27, 2022, and opened a 30-day comment period.   *See* AR 83.   On January 27, 2023, the Agencies issued their Section 4(f) Limited Scope Re-Evaluation, Pursuant to 49 USC 303 Department of Transportation Act of 1966.   AR 186.   The Agencies observed that Alternative 3, preferred by Plaintiffs, "has a 53% higher Life Cycle Cost than Replacement Alternative 2."   *Id.* at 5877.   The Agencies concluded that the "53% difference in Life Cycle Cost represents a cost of extraordinary magnitude.   The expenditure of additional funds to construct Alternative 3, which has a shorter life span and leaves a fracture critical bridge in place is dismissed as not prudent per 23 CFR 774.17 Part 3 (iv)."   *Id.*   The Agencies reasoned that "there is added risk and uncertainty to keeping a fracture critical bridge in service beyond its intended service life, even if it is extensively rehabilitated."   *Id.* at 5875.   According to the Agencies, "[s]pending 53% more money to rehabilitate, maintain, and frequently inspect a fracture critical bridge that comes with more stringent and costly federal inspection requirements, traffic impacts, and increased user costs to the public" was "not prudent, and b[ore] on the consideration of whether that 53% differential constitute[d] one of an extraordinary magnitude."   *Id.* at 5875–76.   The Agencies found that service-life costs further supported their conclusion because "a 53% difference in net present values between Rehabilitation Alternative 3 and Replacement Alternative 2 translate[d] to increased undiscounted costs to the agencies that is nearly double."   *Id.* at 5876.

In February 2023, Plaintiffs filed this case, seeking declaratory and injunctive relief on the ground that Defendants did not comply with NEPA and section 4(f) because they used cost estimates from the 2016 Preliminary Design Report rather than 2022 cost estimates reflecting the nearly threefold increase in construction costs. *See id.* at 5883 (stating that Alternative 2 would cost $42 million using 2022 cost estimates).

In March 2023, MDOT awarded a nearly $50-million-dollar construction contract to begin the replacement project.[2]  In April, Plaintiffs moved for a preliminary injunction to halt construction of the new bridge.  In July, I denied Plaintiffs' request for a preliminary injunction.  *Nat'l Tr. for Historic Pres. v. Buttigieg*, No. 2:23-CV-00080-LEW, 2023 WL 4847260 (D. Me. July 28, 2023), *appeal filed* No. 23-1630 (1st Cir. Jul. 31, 2023).  I explained that Plaintiffs' likelihood of success was not promising because the various NEPA regulations referenced by Plaintiffs did not require further agency action without a change in the project's administrative approval or environmental impact.  *See id.* at *4.  I also reasoned that it was unlikely that the Agencies acted arbitrarily and capriciously by using 2016 cost estimates and concluding that the rehabilitation alternatives resulted in costs of an extraordinary magnitude.  *See id.*  I explained that Plaintiffs failed to show a likelihood of irreparable harm since the Bridge would not be demolished until after the new bridge was constructed, and I anticipated ruling on the merits before then.  *See id.*

---

[2] Though MDOT's award of the construction contract lies outside of the administrative record, Plaintiffs have referenced the contract throughout the litigation, and Defendant Van Note acknowledges that a contract was awarded.  *See* Def. Van Note's Cross-Motion for Summ. J. at 9.

Plaintiffs filed a notice of appeal and sought an injunction pending appeal from the First Circuit.  The First Circuit denied the motion without prejudice because Plaintiffs did not request an injunction pending appeal before me.  Plaintiffs then asked me to enjoin construction pending appeal, and I denied their request.  Plaintiffs later filed another motion with the First Circuit, seeking an injunction pending appeal.  In September, the First Circuit denied Plaintiffs' renewed emergency motion for an injunction pending appeal.  The court explained that its "strictly limited remand did not provide the occasion for a new foray by the plaintiffs and, in any event, the new foray now attempted does not look especially promising, even were its pursuit otherwise appropriate notwithstanding our strictly limited remand."  Order, No. 23-1630 (1st Cir. Sept. 8, 2023).  The parties have now filed motions for summary judgment on the administrative record.

## DISCUSSION

The final administrative decisions contain the Agencies' findings concerning NEPA and section 4(f).  Because my review is limited to the administrative record, there are no issues of material fact, and summary judgment is an appropriate procedure for resolving these challenges.[3]  *Protect Our Lakes v. U.S. Army Corps of Eng'rs*, No. 1:13-CV-402-JDL, 2015 WL 732655, at *2 (D. Me. Feb. 20, 2015).  While each statute supplies standards for the Agencies to apply during their decision-making processes, my review of the Agencies' determinations is governed by the Administrative Procedures Act.  *See Historic*

---

[3] Plaintiffs' appeal of my order denying their motion for a preliminary injunction is still pending before the First Circuit.  Nonetheless, I may still rule on the merits.  *See Contour Design*, *Inc. v. Chance Mold Steel Co.*, 649 F.3d 31, 33–34 (1st Cir. 2011).

*Bridge Found.*, 22 F.4th at 281 (citing *Conservation L. Found. v. Fed. Highway Admin.*, 24 F.3d 1465, 1471 (1st Cir. 1994)).  The Administrative Procedures Act instructs reviewing courts to "hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  NEPA and section 4(f) determinations "are subject to [the] highly deferential abuse of discretion standard of review."  *Conservation L. Found.*, 24 F.3d at 1471; *see also Airport Impact Relief, Inc. v. Wykle*, 192 F.3d 197, 203 (1st Cir. 1999) ("While this is a highly deferential standard of review, it is not a rubber stamp.").  In reviewing a NEPA challenge, I must "carefully review[ ] the record and satisfy [myself] that the agency has made a rational decision" that is "founded on a reasoned evaluation of the relevant factors."  *Airport Impact Relief, Inc.*, 192 F.3d at 203.  My review of section 4(f) is "more stringent."  *Save Our Heritage, Inc. v. F.A.A.*, 269 F.3d 49, 58 (1st Cir. 2001).

## A.  The National Environmental Policy Act

NEPA requires federal agencies to "include a detailed statement of environmental consequences known as an environmental impact statement 'in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.'"  *Kleppe v. Sierra Club*, 427 U.S. 390, 394 (1976) (footnote omitted) (quoting 42 U.S.C. § 4332(2)(C) (1975)).  Draft or final environmental impact statements must be supplemented "if a major Federal action remains to occur, and either "[t]he agency makes substantial changes to the proposed action that are relevant to environmental concerns" or there are "significant new circumstances or information

relevant to environmental concerns and bearing on the proposed action or its impacts."[4]  40

C.F.R. § 1502.9(d); *see also* 23 C.F.R. § 771.130(a) (requiring environmental impact

statements to be supplemented when the Administration determines that "[c]hanges to the

proposed action would result in significant environmental impacts that were not evaluated

in the EIS" or when "[n]ew information or circumstances relevant to environmental

concerns and bearing on the proposed action or its impacts would result in significant

environmental impacts not evaluated in the EIS"); *accord Marsh v. Oregon Nat. Res.

Council*, 490 U.S. 360, 374 (1989) (explaining that "NEPA does require that agencies take

a 'hard look' at the environmental effects of their planned action, even after a proposal has

received initial approval" and that "the value of the new information to the still pending

decision-making process" determines whether an EIS must be supplemented).  FHWA

"must determine, prior to granting any new approval related to an action or amending any

previously approved aspect of an action, including mitigation commitments, whether an

approved environmental document remains valid." 23 C.F.R. § 771.129.

NEPA's "requirements are procedural in nature."  *United States v. Coal. for

Buzzards Bay*, 644 F.3d 26, 31 (1st Cir. 2011) (citing *Dep't of Transp. v. Pub. Citizen*, 541

U.S. 752, 756 (2004)).  Thus, so "long as the environmental effects of a proposed action

have been adequately identified and studied, the agency is free to weigh those effects and

---

[4] The Federal Defendants maintain that 40 C.F.R. § 1502.9(c)(1)(ii) (2019) is the operative version of the
regulation for purposes of this litigation because FHWA's NEPA review concluded then.  That regulation
was renumbered to 40 C.F.R. § 1502.9(d)(1)(ii) in 2020.  Because Plaintiffs are raising arguments
concerning Defendants' ongoing NEPA obligations, the current version of the regulation applies to this
case.  I also note that the operative language between the 2019 regulation and the present regulation is the
same.

decide—within the limits fixed by the APA—that other values overbalance environmental costs." *Id.* (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).

Plaintiffs contend that NEPA and related federal regulations require the Agencies to produce supplemental documents to reflect the increased costs of constructing a new bridge. Defendants disagree and argue that I cannot consider the merits of these arguments because they were rejected by the First Circuit and are outside of the scope of the First Circuit's limited remand. On the merits, Defendants argue that supplemental documents are not required since only the project's cost—rather than its environmental impact—has changed.

### 1. *The Mandate Rule*

Defendants argue that the First Circuit already addressed Plaintiffs' NEPA arguments and that the scope of the First Circuit's remand prohibits me from considering the merits of Plaintiffs' contentions.[5] Plaintiffs disagree, reasoning that they have raised new NEPA arguments stemming from the increase in construction costs and that Defendants must still comply with NEPA despite the First Circuit's remand instructions.

The "appellate mandate constrains the scope of proceedings on remand" by requiring "a court to 'scrupulously and fully' carry out a higher court's order after remand." *Diaz v. Jiten Hotel Mgmt., Inc.*, 741 F.3d 170, 175 (1st Cir. 2013) (quoting *Doe v. Chao*,

---

[5] The Federal Defendants contend that Plaintiffs attempted to fashion a new NEPA claim in their reply brief. I do not, however, read Plaintiffs' reply brief as raising a new NEPA claim; instead, I understand the Plaintiffs to be responding to Defendants' arguments about the mandate rule.

511 F.3d 461, 464 (4th Cir. 2007)).  "On remand, courts are often confronted with issues that were never considered by the remanding court." *Biggins v. Hazen Paper Co.*, 111 F.3d 205, 209 (1st Cir. 1997).  In these circumstances, the district court may address "any issue not expressly or impliedly disposed of on appeal."  *Id.* (quoting *Stevens v. F/V Bonnie Doon*, 731 F.2d 1433, 1435 (9th Cir. 1984) (per curiam)).

Because Plaintiffs' arguments concern whether Defendants complied with their ongoing NEPA obligations and were not addressed by the First Circuit, the mandate rule is inapplicable.  By considering Plaintiffs' NEPA arguments, I am not providing the Plaintiffs with a second chance to relitigate matters already rejected by the First Circuit. Plaintiffs argued on appeal that declining to conduct life-cycle cost analysis was "highly controversial," so FHWA had to conduct a full EIS under then-existing regulations. *Historic Bridge Found.*, 22 F.4th at 284 n.11 (quoting 40 C.F.R. § 1508.27(b)(4) (2018) (amended by 85 Fed. Reg. 43,304, 43,322 (July 16, 2020))).  The First Circuit rejected this argument, *see id.*, which concerned a different (and now-repealed) NEPA regulation. While Plaintiffs previously presented other NEPA arguments to me, *see Historic Bridge Found.*, 517 F. Supp. 3d at 18–21, they did not appeal my conclusions, *see Historic Bridge Found.*, 22 F.4th at 280 n.6.  Because Plaintiffs present new NEPA arguments in light of the subsequent change in construction costs, their arguments were not disposed of on appeal, so I may consider the merits of their arguments.  *See Biggins*, 111 F.3d at 209 ("Broadly speaking, mandates require respect for what the higher court decided, not for what it did not decide.").

## 2. *The Merits*

On the merits, Plaintiffs cite a slew of regulations and caselaw to argue that Defendants are required to produce supplemental documents because construction costs have increased.  But none of these regulations require further action simply because of a subsequent change in construction costs.

First, Plaintiffs cite 23 C.F.R. § 771.129, which requires FHWA to "determine, prior to granting any new approval related to an action or amending any previously approved aspect of an action" whether "an approved environmental document remains valid."  This regulation is inapplicable because there has been no new approval or amendment to a previously approved aspect of this project.  Plaintiffs' discussion of cases analyzing whether environmental assessments prepared years earlier remained valid is unpersuasive because those cases involved updated construction plans and thus differing environmental consequences.  *See Price Rd. Neighborhood Ass'n*, *Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1509 (9th Cir. 1997) (holding that "conducting an environmental reevaluation is an appropriate procedure for the FHWA to determine the significance of the impacts produced by the modified design and whether a supplemental EA is required"); *Potomac Heritage Trail Ass'n*, *Inc. v. U.S. Dep't of Transp.*, No. 8:22-CV-02482-DLB, 2022 WL 7051160, at *4 (D. Md. Oct. 11, 2022) (explaining that there was a re-evaluation "in light of the current updated bridge design" to determine if a previous Finding of No Significant Impact and Final Section 4(f) Evaluation "remained valid").  Here, by contrast, the construction

plan and corresponding environmental impact have remained the same—only construction costs have changed.

Second, Plaintiffs reference 40 C.F.R. § 1502.9(d)(1)(ii), which requires agencies to prepare supplemental environmental impact statements when agencies make "substantial changes to the proposed action that are relevant to environmental concerns," or there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." This regulation's plain text indicates that there must be some change relevant to environmental concerns, and that is lacking here.

Third, Plaintiffs point to 23 C.F.R. § 771.130's requirements concerning when an environmental impact statement must be supplemented. A supplemental environmental impact statement is required when FHWA determines that "[c]hanges to the proposed action would result in significant environmental impacts that were not evaluated in the EIS," or "[n]ew information or circumstances relevant to environmental concerns and bearing on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS." 23 C.F.R. § 771.130(a). Plaintiffs' reading of this regulation is similarly flawed. Without a change to a project's environmental impact, there can be no change resulting in significant environmental impacts not previously evaluated.

Plaintiffs' discussion of caselaw is also unpersuasive. Plaintiffs quote the Supreme Court's opinion in *Marsh v. Oregon Natural Resources Council*, where the Court explained that "NEPA does require that agencies take a 'hard look' at the environmental effects of their planned action, even after a proposal has received initial approval." 490 U.S. at 374.

An agency's obligation "turns on the value of the new information to the still pending decisionmaking process." *Id.* If "there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared." *Id.* (alterations in original) (quoting 42 U.S.C. § 4332(2)(c) (1988)). Plaintiffs also rely on *Conservation Law Foundation v. Watt*, a case in which the district court held that the plaintiffs had demonstrated a likelihood of success on the merits of their claims that environmental impact statements were inadequate because updated information indicated that there would be 97% less oil than previously anticipated from the land in question. 560 F. Supp. 561, 570–71 (D. Mass. 1983), *aff'd sub nom. Massachusetts v. Watt*, 716 F.2d 946 (1st Cir. 1983). The district court stated that "[i]t is apparent that a change, by several orders of magnitude, in the benefits" from a proposed action amounts to "'substantial changes in the proposed action,' directly relevant to the reasoned decision-making and balancing of environmental cost against economic benefit that NEPA requires." *Id.* at 571 (quoting 40 C.F.R. § 1502.9(c)(2) (1983)). The First Circuit affirmed the district court, explaining that the agency erred because "the FEIS did not describe the likely environmental harms well enough to allow the Secretary to make an informed decision" because "expecting 31 times as much oil significantly affected the description of environmental consequences." *Watt*, 716 F.2d at 948.

Based on the Supreme Court's reasoning in *Marsh* and the district court's reasoning in *Watt*, Plaintiffs argue that the change in construction costs requires supplemental NEPA documents. *See* Plaintiffs' Opp'n & Reply at 8–9 (arguing that "a change in the cost of the

replacement bridge by several orders of magnitude is directly relevant to the decision to select this environmentally harmful alternative based on the false assumption that its costs would supposedly be lower than the costs of the rehabilitation alternative"); *see also id.* at 7 (contending that "because the lower cost of the replacement bridge was the sole basis for the selection of the environment damaging alternative," using the updated costs of the replacement bridge "would radically affect the outcome of the Agencies' NEPA (and Section 4(f)) reviews").

I disagree with Plaintiffs' reading of *Marsh* and *Watt*. Plaintiffs' reliance on *Marsh* is misplaced because, simply put, there is no "new information" showing that this project will affect the quality of the human environment "in a significant manner or to a significant extent not already considered" since only the project's costs have changed. *Marsh*, 490 U.S. at 374. I also find Plaintiffs' reliance on *Watt* to be unpersuasive. Read in isolation, the district court's language appears to conflate a project's benefits with its environmental costs. But the First Circuit's opinion provides additional context explaining why that project's benefit, measured by how much oil could be expected, was relevant to the environmental concerns. The quantity of oil expected was directly connected to the resulting environmental impact since the "corresponding smaller number of platforms, wells, and pipelines needed to explore for and develop these resources" altered the environmental impact. *Watt*, 716 F.2d at 949. Thus, a supplemental EIS was required because the Final EIS did not "tell [the Secretary] *by how much* the previous FEIS estimate

of likely environmental harm" would be reduced.  *Id.*  Such a connection between costs and the environmental impact is absent here.[6]

Plaintiffs also rely on out-of-circuit authority.  Plaintiffs quote the Tenth Circuit's decision in *Utahns for Better Transportation v. United States Department of Transportation*, which stated that "given the importance of the relative costs to the alternative analyses in the EIS, more than nothing was required." 305 F.3d 1152, 1166 n.6 (10th Cir. 2002), *as modified on reh'g*, 319 F.3d 1207 (10th Cir. 2003).  Plaintiffs argue that the Tenth Circuit required supplemental documents to reflect updated costs.  But this reads the Tenth Circuit's comment within a footnote out of context.  The Tenth Circuit held that the agencies erred because they did not "verify the accuracy of information supplied by an applicant" or "respond to substantive issues raised in comments" as required by their regulations.  *Id.* at 1165.  The Tenth Circuit's observation concerning costs responded to one alternative having no cost methodology whatsoever.  *See id.* at 1166 (remarking that "there [was] no cost methodology applicable to" an alternative "in the record" and that this "also demonstrate[d] why the FEIS [was] inadequate to meet the NEPA goals of informed decisionmaking and public comment").  Plaintiffs also reference the Sixth Circuit's decision in *Coalition for Advancement of Regional Transportation v. Federal Highway*

---

[6] The First Circuit's more recent observation in *Historic Bridge Foundation* that "[w]hether an agency compares cost estimates of various alternatives using the appropriate methodology has no bearing on whether there is a controversy over the effects on 'the quality of the human environment'" implies that cost is, by itself, not relevant to a project's environmental consequences. 22 F.4th at 284 n.11 (quoting 40 C.F.R. § 1508.27(b)(4) (2018) (amended by 85 Fed. Reg. 43,304, 43,322 (July 16, 2020))).  Plaintiffs attempt to distinguish the First Circuit's language in *Historic Bridge Foundation* by arguing that the court was addressing a now-repealed NEPA regulation.  While that distinction is true, it does not undermine the inference that I draw from the First Circuit's language.

*Administration*, 576 F. App'x 477, 483 (6th Cir. 2014), another case concerning a NEPA challenge to a bridge project.  That unpublished decision, however, merely noted that "[a]s a result of comprehensive changes to the design and funding of the Project and public concern over potential tolling, the [FHWA] and the States decided to prepare a Supplemental EIS for public review and comment."  *Id.*  Notably, that case implicated a change to the project's design, and the court did not require the agencies to prepare a supplemental EIS; instead, the agencies themselves decided to prepare it.

Ultimately, I reject Plaintiffs' reading of NEPA and the applicable regulations because it is a textual and unsupported by caselaw.  I next consider Plaintiffs' arguments regarding section 4(f).

**B.  Section 4(f) of the Department of Transportation Act**

Plaintiffs argue that the Agencies violated the First Circuit's remand instructions as well as section 4(f) by using 2016 cost estimates in their section 4(f) analysis.  Plaintiffs argue that if updated cost estimates were used, bridge rehabilitation would be a prudent and feasible alternative.  Plaintiffs also contend that FHWA failed to engage in reasoned decision-making.  Defendants argue that they properly used 2016 cost estimates and that FHWA engaged in reasoned decision-making in concluding that the 53% price differential represented a cost of an extraordinary magnitude under 23 C.F.R. § 774.17.

Unlike NEPA's procedural requirements, section 4(f) "imposes a substantive mandate."  *Neighborhood Ass'n of the Back Bay*, *Inc. v. Fed. Transit Admin.*, 463 F.3d 50, 64 (1st Cir. 2006).  Under section 4(f), federal agencies regulating transportation matters

may "approve projects that entail the use of historically significant sites." *Safeguarding the Historic Hanscom Area's Irreplaceable Res.*, *Inc. v. F.A.A.*, 651 F.3d 202, 207 (1st Cir. 2011) (citing 49 U.S.C. § 303(c) (2005)).  Transportation projects requiring the use of a historically significant site can only be approved if "there is no prudent and feasible alternative to using that land," and "the program or project includes all possible planning to minimize harm to the . . . historic site resulting from the use."  49 U.S.C. § 303(c); *see also* 23 C.F.R. § 774.17 (defining what is a feasible and prudent avoidance alternative). These requirements "apply both when a proposal involves the physical use or occupation of a protected property thought to be historic and when a proposal involves indirect (but meaningful) effects on historic venues."  *Safeguarding*, 651 F.3d at 207–08.

The parties agree that MDOT and FHWA's chosen replacement alternative entails the use of a historic site and that each alternative considered by the Agencies was feasible from an engineering standpoint.  The parties disagree as to whether the Agencies reasonably concluded that the rehabilitation alternatives were imprudent because they involved costs of an extraordinary magnitude.  I first consider Plaintiffs' arguments concerning whether the Agencies erred by using 2016 cost estimates.

### 1.  Cost Estimates

A "simple but fundamental rule of administrative law" is instructive in determining whether the Agencies were required to use updated costs estimates.  *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).  Under *Chenery*, "a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make,

must judge the propriety of such action solely by the grounds invoked by the agency." *Id.* Thus, if an agency's proffered reasons "are inadequate, a court may remand for the agency" to "offer 'a fuller explanation of the agency's reasoning *at the time of the agency action.*'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) (quoting *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990)). This "has important limitations" because when "an agency's initial explanation 'indicate[s] the determinative reason for the final action taken,' the agency may elaborate later on that reason (or reasons) but may not provide new ones." *Id.* at 1908 (quoting *Camp v. Pitts*, 411 U.S. 138, 143 (1973) (per curiam) (alteration in original)).

Thus, FHWA could offer a fuller explanation of why the rehabilitation alternatives were imprudent as entailing costs of an extraordinary magnitude following the First Circuit's remand. But in elaborating on its reasoning, FHWA was required to use the 2016 cost estimates because those estimates were before the agency "*at the time of the agency action.*" *See id.* at 1907.

By using the 2016 cost estimates, the Agencies also complied with the First Circuit's remand instructions. The First Circuit remanded "with instructions that the matter be returned to the FHWA for the strictly limited purpose of allowing the agency to further justify use of the service-life analysis and/or to decide whether a 53% price differential represents a cost of an extraordinary magnitude under 23 C.F.R. § 774.17." *Historic Bridge Found.*, 22 F.4th at 286. The First Circuit invoked the *Chenery* rule by explaining that "it is for the FHWA, not this court (or counsel on appeal), to make the judgment call in the first instance regarding whether the 53% delta represents an extraordinary cost

increase against which prudence counsels." *Id.* (citing *Chenery Corp.*, 332 U.S. at 196). The court's language about the 53% price differential clearly referenced the court's earlier discussion about the cost differential between replacement and rehabilitation alternatives when using LCCA and the 2016 cost estimates. *See id.* (discussing the 53% difference). More recently, the First Circuit, in denying Plaintiffs' renewed emergency motion for an injunction pending appeal, suggested that this reading of the remand order is correct by explaining that its "strictly limited remand did not provide the occasion for a new foray by the plaintiffs." Order, No. 23-1630 (1st Cir. Sept. 8, 2023).

Therefore, I conclude that the Agencies correctly used 2016 cost estimates.[7] I next consider Plaintiffs' arguments concerning whether FHWA engaged in reasoned decision-making.

### 2. *Reasoned Decision-making*

Lastly, Plaintiffs contend that FHWA failed to engage in reasoned decision-making in concluding that the 53% price differential was a cost of an extraordinary magnitude. Plaintiffs characterize FHWA as simply rubberstamping its previous conclusion and stating that service-life cost analysis is valid. Plaintiffs also argue that the Agencies gave no weight to the historic value of the Bridge and that the Agencies cannot rely on notions of safety and efficiency in this context. Defendants contend that FHWA engaged in reasoned decision-making.

---

[7] Because the Agencies' section 4(f) analysis properly used the 2016 cost estimates, it is unnecessary to consider Plaintiffs' arguments concerning whether the rehabilitation alternatives would be a prudent and feasible alternative if 2022 cost estimates were used.

Plaintiffs' arguments fall apart after reviewing the Section 4(f) Limited Scope Re-Evaluation.  In that document, FHWA complied with my remand order by thoroughly describing its methodology for calculating life-cycle costs.  AR 186 at 5869–74.  First, FHWA calculated the service life and estimated costs of the Alternatives.  *Id.* at 5869–71.  Second, FHWA applied a present-value calculation to future expenditures to permit a comparison of the present costs for each Alternative.  *Id.* at 5871–72.  Third, FHWA made an adjustment to the rehabilitation alternatives so they could be compared to an equivalent analysis period of 100 years.  *Id.* at 5872.  Fourth, FHWA provided the estimated life-cycle and service-life costs for the Alternatives.  *Id.* at 5873–74.  Based on this analysis, the replacement project under Alternative 2 entailed a discounted LCCA value of $13,720,000.  Alternative 3, the cheaper rehabilitation project, had a discounted LCCA value of $20,990,000, which is 53% higher than Alternative 2.  *See id.* at 5874.  "Based upon this consideration alone," FHWA concluded that "Alternatives 3 and 4 present costs of extraordinary magnitude and are not prudent avoidance alternatives."  *Id.* at 5875.

FHWA and MDOT "also considered additional factors that support this conclusion," such as the rehabilitation alternatives requiring "the State of Maine to bear the costs and risks of keeping a Fracture Critical Bridge in the State Asset Inventory."  *Id.* at 5875.  FHWA explained that "there is added risk and uncertainty to keeping a fracture critical bridge in service beyond its intended service life, even if it is extensively rehabilitated."  *Id.*  While the cost analyses reflect the increased costs for inspection and future routine maintenance, the costs analyses "do not fully capture the risk of unexpected but needed repairs or rehabilitations.  If a fracture critical component were to fail, it could

cause a bridge to collapse." *Id.* FHWA further expressed concern over "the cost of the inspections and the disruptions they cause." The Agencies also "took account of differences in Service Life Cost[s] between the various alternatives given that inquiry reflects [MDOT's] funding realities and limited ability to budget for future costs." *Id.* FHWA reasoned that "the difference in cost estimates under the Service Life Cost analysis makes the substantial differences in cost between the replacement and rehabilitation alternatives more apparent." *Id.* at 5876. FHWA explained that

> the increased challenges presented by the rehabilitation options are relevant to assessing the magnitude of cost differences among the alternatives and determining if additional expenditure for an avoidance alternative is prudent. Spending 53% more money to rehabilitate, maintain, and frequently inspect a fracture critical bridge that comes with more stringent and costly federal inspection requirements, traffic impacts, and increased user costs to the public is not prudent, and bears on the consideration of whether that 53% differential constitutes one of an extraordinary magnitude.

*Id.* at 5875–76.

While Plaintiffs attempt to characterize FHWA as only making a "passing reference to [the] relevant factors" and rubberstamping its previous conclusion, I find that FHWA sufficiently articulated the basis for its decision using the proper factors under 23 CFR § 774.17. *Missouri Pub. Serv. Comm'n v. FERC*, 234 F.3d 36, 41 (D.C. Cir. 2000). FHWA explained the factors relevant to its analysis in deciding whether an alternative is prudent, *see* AR at 5877, and adequately explained that the difference in life-cycle costs was a cost of extraordinary magnitude. I also reject Plaintiffs' argument that the Agencies merely asserted that service-life costs were valid because the Agencies explained how service-life costs further supported its conclusion reached through LCCA. *See id.* at 5876.

Plaintiffs also argue that FHWA gave no weight to the value of section 4(f)-protected historic properties being destroyed and that because the price of the rehabilitation alternatives was the basis for rejecting those alternatives, the cost rationale must be balanced against the value of protecting historic properties. The Agencies contend that section 4(f) and FHWA's regulations define the scope of protections for historic properties and that a site's historic value is not entitled to additional weight.

Plaintiffs' argument that the Bridge's historic value was given insufficient weight relies on *Citizens to Preserve Overton Park*, *Inc. v. Volpe*. 401 U.S. 402 (1971). There, plaintiffs sued to enjoin the Secretary of Transportation from releasing federal funds to a state highway department to construct a segment of an expressway through a city park. *Id.* at 406. The plaintiffs argued that there was a "feasible and prudent" alternative route. *Id.* at 405. In its analysis, the Court explained that "the very existence of" statutes, like section 4(f), "indicates that protection of parkland was to be given paramount importance." *Id.* at 412–13.

Plaintiffs latch onto the "paramount importance" language and argue that FHWA was required to give additional weight to the historic value of the Bridge. Interpreting section 4(f) in light of *Overton Park*, the Seventh Circuit has recognized that "the reasons for using" "protected land have to be good ones, pressing ones, well thought out." *Eagle Found.*, *Inc. v. Dole*, 813 F.2d 798, 805 (7th Cir. 1987). But even after "a strong presumption" against using protected land, "it may be prudent to use the § 4(f) land. If the Secretary makes that hard decision, it must be respected." *Id.* Here, the Secretary has made that determination and acted consistently with section 4(f) and applicable regulations.

Contrary to Plaintiffs' argument, FHWA did consider the Bridge's historic value in the 2019 Section 4(f) Evaluation, *see* AR 9 at 1182–1185, which the Limited Scope Section 4(f) Re-Evaluation supplements. *See* AR 186 at 5878 (explaining that "[a]ll other portions of the 2019 Section 4(f) Evaluation remain unchanged").

Plaintiffs also fault FHWA's finding of imprudence based on safety and efficiency because, in their view, such a "wide-ranging balancing of competing interests" is impermissible.[8] *Citizens to Pres. Overton Park*, *Inc.*, 401 U.S. at 411. Defendants maintain that these considerations are proper since FHWA must determine whether a proposal is "prudent."

In *Overton Park*, the Supreme Court explained that it was improper for the Secretary of Transportation to weigh "the detriment resulting from the destruction of parkland against the cost of other routes, safety considerations, and other factors" to determine "on the basis of the importance that he attaches to these other factors whether, on balance, alternative feasible routes would be 'prudent.'" *Id.* at 411–12. The Court emphasized that these factors, which "are common to substantially all highway construction" projects, would be improper to consider because "if Congress intended these factors to be on an equal footing with [the] preservation of parkland[,] there would have been no need for the[se] statutes" protecting parkland. *Id.* at 412. Thus, explained the Court, "the Secretary cannot approve

---

[8] Plaintiffs also contend that FHWA's reliance on "safety" and "efficiency" is a post-hoc rationalization since the Agencies are relying on "fictional assumptions about costs." Plaintiffs' Opp'n & Reply at 18. This argument fails. As I have explained above, the Agencies correctly used 2016 cost estimates. Furthermore, the Limited Scope Section 4(f) Re-Evaluation considered safety concerns and explained why it would be more efficient to construct a new bridge, so the references to safety and efficiency were not post-hoc rationalizations for litigation. AR 186 at 5875–77.

the destruction of parkland unless he finds that alternative routes present unique problems." *Id.* at 413.

Plaintiffs argue that FHWA's reliance on safety and efficiency is akin to the "wide-ranging balancing of competing interests" that the *Overton Park* Court forbade. *Id.* at 411. I disagree. As the First Circuit has explained, the Supreme Court's explanation in *Overton Park* was "situation-specific" and "tailored to fit situations in which, from a practical standpoint, there otherwise would be a perverse incentive in favor of using protected land for federal transportation projects." *Safeguarding*, 651 F.3d at 208. While "section 4(f) imposes significant obligations upon a reviewing agency," Plaintiffs "attempt to festoon those obligations with magic words, selectively culled from the *Overton Park* opinion," and thus "distort[ ] the statute and overread[ ] the Court's teachings." *Id.* at 209. The Agencies' "obligations are what the statute says they are." *Id.* Under section 4(f), the Seventh Circuit has explained that a "prudent judgment by an agency is one that takes into account everything important that matters. A cumulation of small problems may add up to a sufficient reason to use § 4(f) lands." *Eagle Found.*, *Inc*, 813 F.2d at 805; *see also Safeguarding*, 651 F.3d at 211 ("An agency legitimately may invoke an accumulation of factors to rule out an alternative as imprudent." (citing *Eagle Found.*, *Inc*, 813 F.2d at 805)). Thus, in a case involving the demolition of an existing hangar and construction of a new fixed based operator facility, the First Circuit reasoned that "[i]n this context, prudence is largely a matter of safety and efficiency." *Safeguarding*, 651 F.3d at 213.

FHWA's reasoning rested on the difference in life-cycle costs. *See* AR 186 at 5875 ("Based on this consideration alone, FHWA concludes that Alternatives 3 and 4 present

costs of extraordinary magnitude and are not prudent avoidance alternatives."). However, FHWA's regulations recognize that considerations of safety and efficiency are relevant to whether an alternative is prudent. *See* 23 C.F.R. § 774.17 (explaining that an "alternative is not prudent if" it "results in unacceptable safety or operational problems" or "results in additional construction, maintenance, or operational costs of an extraordinary magnitude"); *see also Eagle Found.*, *Inc.*, 813 F.2d at 804 ("For some statutes cost is no object. Nothing in the language or legislative history of § 4(f) suggests such an extreme position, and the statutory use of 'prudent' cuts the other way." (internal citation omitted)). Thus, FHWA did not err by explaining how safety and efficiency concerns further supported their conclusion reached through life-cycle cost analysis.

## CONCLUSION

The Agencies' "determination that none of the [rehabilitation] alternatives would be prudent was, on the record before [them], well within the universe of reasonable outcomes. When that is true, it is not the place of a reviewing court to second-guess the agenc[ies]." *Safeguarding*, 651 F.3d at 213. Thus, Plaintiffs' Motion for Summary Judgment (ECF No. 46) is DENIED; Defendant Commissioner Van Note's Cross-motion for Summary Judgment (ECF No. 49) is GRANTED; and Federal Defendants' Cross-motion for Summary Judgment (ECF No. 50) is GRANTED.

SO ORDERED.

Dated this 5th day of January 2024.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE